Good morning everyone. This is the time and place set for argument in the case of Jones v. Ryan. Good morning, counsel. Good morning, Your Honor. Please proceed. May it please the court, opposing counsel, my name is Miles Braccio. I'm an assistant attorney general and I represent the warden in this matter. Your Honors, this case today presents nothing more than a habeas petitioner who hired several new experts many years after his convictions and sentences in an attempt to undermine the jury's verdicts. And surprisingly, the relevant experts in this case all but confirmed his guilt for fatal neglect, a predicate felony for felony murder, and they could not rule him out for the sexual assault, a second predicate for felony murder. And this is all in a case in which Jones was directly observed violently assaulting 4-year-old Rachel Gray in his van the day before her death. I thought they couldn't rule him out as to, I can't remember the count numbers, but the sexual assault, I thought, you'll have to remind me on the expert testimony there, but I thought it was pretty much, if you believe these new experts, as the district court did, you'd have to throw out all of the convictions except maybe for count 4 and then that was tied to count 5. So remind me why you're saying that the expert's new testimony doesn't affect the sexual assault conviction? Sure, Your Honor. So this is in the prejudice prong and the Strickland argument. These experts testified, so there were two experts that were involved with the sex assault injury and looking at that, Dr. Oppoven and then Dr. Keene, who was the original pathologist contacted at trial. And Dr. Oppoven said something in her interview, and I'll never forget it, and she repeated it at the hearing, so we have the testimony in front of the court. She said, I cannot say that she was not sexually misused multiple times. So when she looked at the pathology, she admitted that she saw an older injury as well as a newer injury. How is that tied to the petitioner? I thought the state's whole theory at trial was that the reason we knew it was him was because the injuries occurred during this very narrow time window in which he was with the young girl alone. Correct, and so I think what Dr. Oppoven and then Dr. Keene's testimony does is say that when we have the circumstantial evidence that she's with Jones on that Sunday afternoon during that time, and then you compare that with the pathology evidence that they're seeing a newer injury, you can put those two together to say that that's when she was injured. But counsel, wasn't that the point that there was doubt as to the actual time of the fatal event? That was the point, that it was difficult for anyone to narrow in on the precise time when the incident occurred, right? Correct, in terms of the pathology, yeah, you cannot date it in this kind of fashion. The medical evidence is just not that precise. You can't say on Sunday afternoon at 2 o'clock, this is when she was injured and that's what the pathology is telling me. But wasn't that what the state had to prove in order to get a conviction that the injury occurred in the window where he had sole custody of the young girl? Correct, Your Honor. And so the state didn't rely exclusively on the medical evidence in this case. It had substantial evidence that that's when she suffered the injury. And I would even refer the court back to the Arizona Supreme Court's findings of fact and the trial evidence in this case that Rachel Gray was healthy and well Saturday night, including in the Sunday morning. And the only time that she ever appeared with any of these injuries was after she had taken these numerous trips with Jones on Sunday afternoon. That's where you've got your problem, it seems to me. Because the argument made at trial, persuasive at trial, was that the timeline points to him because it happened the preceding afternoon and he was with her along the preceding afternoon, and that's where you had the evidence or the testimony about beating. I don't think you had testimony with regard to sexual assault. The problem is that the additional evidence that has come in subsequently suggests that timeline doesn't fit. And we're close to the OJ anniversary and things don't fit, you've got to quit, right? Well, the problem here is that if the injuries were actually suffered by the girl earlier, then you open the door to the possibility of other people being responsible. You started your argument by saying that the experts didn't, he didn't use the word exonerate, but didn't show it wasn't him. The problem is that we're not here on an actual innocence claim, we're here on an ineffective assistance claim. And if evidence had come in and been presented to the jury that suggested this timeline doesn't work, it's not the case that he's the guy because he was alone with her at the key time, then why didn't you have a reasonable probability of a different result? So, again, I would refer back to Dr. Howard's trial testimony in which he said these injuries were consistent as occurring on Sunday. Consistence, not enough. Because once you've opened the door to an earlier time period, you open the door to lots of other potential culprits. It's not petitioner's burden in this case to demonstrate I have to be innocent. Nobody could have convicted me. We're here on a reasonable probability of a different result standard. And that seems to me to be importantly different from the argument you're trying to make. Okay. And, you know, maybe I can move on to Judge Wofford's second point, which is about the fatal neglect. Because I think there, there's no question that Jones's own experts in the Martinez hearing confirmed it. Let me pose that question then. Okay. The problem that I have there, and I'm struggled with this one, so I'm not trying to say I'm fixed on it, but the problem I have there is that the mother was acquitted. Rather, was convicted but was not convicted on the required level of intent that's required to make felony murder. I mean, she winds up being convicted but on a reckless standard that gives her, I think, eight years. I forget. And the argument you're trying to make may have some traction, and indeed, I think, may well have some traction with regard to whether that conviction stands, but whether that conviction can support felony murder, that's really the question that's teed up for us now. And the result in her case suggests to me that there's a reasonable probability with the additional evidence the jury might have come out with a similar result in his case. Okay. And let me take those points on, Your Honor, because I think you raised some really good questions there. First of all, we cannot compare juries. We cannot compare what the jury did in the Angela Gray case versus what the jury did in the Jones case. And, of course, defendants are entitled to- Is there a reason why not? Yeah, because why? There are different trials. I believe Powell from the United States- But with reasonable probability as the standard at least suggests, well, okay, maybe you better explain to me why this trial would have produced a different result. Sure. And I think there's one dispositive fact really that separates Barry Jones in this case from the Angela Gray case, and that is that Barry Jones lied to Angela Gray about getting medical help for the child. And so according to Angela Gray, all she understands is that Barry has taken this child down to the fire station. The paramedics have looked at her and cleared her, and there's no issue there. So I think it's appropriate for a jury in the Angela Gray case to say, well, she was lied to by the child's other caretaker. And so I can rest easy on that, you know, even though the child was fatally wounded. Help me with this. I'm kind of lost in the facts. I remember about him telling somebody about going to see the paramedics. I didn't recall that it was her. What was the context of that? And so let me walk you through that, because I think the district court, for this predicate felony and for the ineffective assistance of counsel, really only has two holdings from what I can gather. It's the mens rea and the intertwined theory. And so let me address both of those. The court held at page 83 of its order that potentially Barry Jones did not know how severely harmed she was, didn't know the extent of her injuries. And we cited the case to the district court and we cited it to this court. That's a misinterpretation of Arizona law. Under state versus pain, the Arizona Supreme Court interpreted this statute, and the condition of the child is an objective factor proved by circumstantial or direct evidence. So the mens rea doesn't go to his knowledge of the severity of her injuries. Wait, wait, wait. I don't understand that. Okay. I mean, your brief says that he has to intend or at least know that she's in danger. Correct, Your Honor. That she's harmed, but not to the extent of those injuries. And state versus pain makes that very clear. So he just has to be aware. I'm sorry, Jennifer. No, go ahead. I was just going to say he has to be aware that Rachel is harmed and needs medical attention. But to the extent of those injuries, whether that results in substantial bodily injury or death, is an objective factor. So the mens rea does not go to that aspect. It goes to the failure to render aid. And so what does endangered mean? It means that the child is harmed. You have kids. I had kids. There are times they seem really sick. I'm not a doctor. My wife's not a doctor. We're not sure what to do. We try to err on the side of caution. But you don't run to the emergency room for everything that comes along. So where's the dividing line here? And, again, this is what Arizona law says. I would encourage the court to read state versus pain in this regard. And I think it specifically addresses that very question that if you have a child who is endangered and violently harmed, you can't use the excuse that you would probably see in every one of those cases, which is I didn't know how harmed my child was so I didn't seek medical aid. I think you have to err on the side of saying I'm going to seek medical care for my child because I recognize that she's harmed. That's a pretty tough standard to apply a death penalty to. Yeah, forget about the death penalty. You definitely could not, under the Eighth Amendment, give someone a death penalty because they didn't take their kid to the doctor and didn't know that they were going to die. But even for a murder conviction, you're saying under Arizona law, if I know that my child's health is being endangered, but I have no understanding that if I don't get her care, she's going to die or potentially die. And let's say I just don't get her care because, I don't know, I have religious concerns about the nature of the care she'd receive. And so I recognize that I'm taking a risk that maybe her health is going to deteriorate, but I don't have any understanding that she might die. But she nonetheless does die as a result of my not taking her to the doctor. You're saying I could be convicted of murder under Arizona law? Absolutely correct, Your Honor. I can tell you the Eighth Amendment does not permit someone to get the death penalty for doing that. That has got to be true. Correct? And that may be. We've looked at that question. Assuming that the court agreed that Jones had presented enough evidence to take out the sexual assault and the abdominal injury, if he has the fatal neglect predicate felony, which in my view and certainly on this record, stands. It may not stand with knowing and intentional. And you need knowing and intentional to get to the felony murder. So let me address the facts of this case because I think the facts are overwhelming here. On this record, there's no question that Rachel was harmed Sunday night. Jones knew she was harmed and he had a duty to seek aid and did not. Every person who came into contact with this child after she reappeared with Barry Jones after these multiple trips immediately recognized the severity of her injuries and told Jones, you need to take her to the hospital. So this is not the kind of case in which we have some sort of phantom injury and we don't know what's happening and I don't know how sick my child is. You don't even have to rely on sort of the descriptions of the witnesses, although I'll get to those in a minute here. But this is a case in which every person who saw this child who came into contact with her said, you need to take her immediately to the emergency room. The first person being Stephanie Fleming who saw her in the trailer park when she was curled up in a ball under the camper shell. And then Rachel subsequently went in and was dry heaving, was soaking wet. And then that night as she's laying on the couch, three witnesses came in, Terry Shane Richmond, Kim Hillman, and Joyce Richmond, all told Barry Jones, you need to take her to the hospital. And that was correct. This child was in the death process that night, and that's according to Jones' own experts in the Martinez hearing. He's not a doctor. That's, I guess, the problem I have with that theory. How is he supposed to know the extent of the danger that the child is facing? He's not, Your Honor. He's supposed to know that the child's harmed and in need of help. Angela Gray knew the same thing. She was not convicted of felony murder. True, but Angela Gray was also told by Barry Jones that he had taken her for medical help and the paramedics had cleared her. That's what I was going to ask you, if you see the facts differently for Angela and for Jones. I do. I think the one dispositive fact is Jones lying to all four of these people who told her, you need to take her to the hospital. But the fact that they told Angela Gray as well, that he told her, I had already taken her to be checked out by the paramedics, that to me is the dispositive fact which separates it. I understand, although I still think the jury in Angela Gray's case got it wrong. I think Angela Gray had just as much of a requirement to take this child to the hospital. That really doesn't help you, though, does it? I mean, an argument based on the jury got it wrong? We're here with a reasonable probability, and you can't be sure you're going to get a jury different from the jury there. So I'm not sure the jury got it wrong. I don't see any persuasion to that. So let me continue with the facts here. So Jones affirmatively lied to all of these people that he had already sought medical care for Rachel Gray when all these people told him. So this is not even a case of where he's not taking her to get medical help. He's affirmatively dissuading everyone else from seeking help for this girl. That's not something that came away from my review of the record with that impression. What is there that supports that proposition? This affirmative persuasion of Angela and the others. I mean, he doesn't have to persuade anybody but Angela. She's the mother. She's the one that would need to be persuaded. And I simply didn't carry away the impression you're now imparting. So what should I look at? Well, I would say ER, I can give the court ER 2176, 2183. That's Stephanie Fleming telling Jones that Rachel needs to go to the hospital. Terry Shane Richmond at ER 3253. Tim Hellman, ER 7863 to 66. Joyce Richmond, ER 7833. And Alicia Sloan, ER 3306. And let me also continue on this. So the injuries that Rachel had suffered that night where she's laying there bruised, she's bleeding from the head, which is an inch-long laceration that cuts through all aspects of the scalp and the tissue exposing her skull. She's emitting a sound between a cry and a scream, and she's repeatedly vomiting every time she tries to take a sip of water. And so then let's talk about Jones' statements in the interrogation, which came into evidence at the Martinez hearing, that he admitted to detectives that he knew she was hurt, he had seen the abnormal bruising, and he let her die. So we have Jones acknowledging that he understands that she's hurt. We're not trying to suggest, though, that he told the officers that he knowingly, you know, killed her by his inaction. That is definitely not what he said. He was feeling remorse, I think is the more logical reading of his statements, that he had obviously knew after the fact that she had died, and that, of course, yes. Obviously, in retrospect, I needed to take her much more quickly than possible. Yeah. But, I mean, I think you tried to suggest this in your brief, which I just found not supported at all by his statements, that he had kind of confessed that, yeah, I knew that she was going to die, and I nonetheless did nothing. And I don't think that's what he ever said. I guess the takeaway for me, the stronger points from his statements and his admissions to police, were that he saw the abnormal bruising, that he knew that no child had done this, because he had started to tell detectives that she had fallen out of the van and that maybe there was this child who had hit her with a bar. And so a lot of his statements were he's eventually giving in to acknowledging that these kinds of injuries she didn't just pick up. These are very severe injuries. The fatal, the injury that caused her death is not one that would be apparent to a non-medical person just looking at the child, right? You can't tell what the nature of this internal damage that she suffered that's going to later cause her to die just by looking at her. I would disagree with that, Your Honor. And I think I would refer you to Jones's own experts, Drs. Opphoven and McKay in the Martinez hearing. This is at ER 8837. This is in her 2002 report, as well as 8847, her 2010 report. Quote, in the hours before Rachel, Angela, and Barry went to bed, it would have been evident to anyone with Rachel that she was in need of immediate medical attention. And so I think Your Honor's right that maybe on the initial injury, and Dr. Hannon, the biomechanics expert they called, talked about the force that it would be required to sever the descending portion of the duodenum and then to have that leak out into the retroperitoneal space, back into the peritoneum. But that would cause severe pain. And the child may get better, not better, but she may be able to deal with that pain momentarily, but it's going to start to simmer, especially as septic shock sets in. And so what you see in the pathology is that eventually you're going to see manifest symptoms that the record shows this child was experiencing. She's not keeping anything down. She's laying there. To me, the abnormal bruising, her complaining, her crying, her inability, I think Dr. Opphoven even said she would have been unable to walk. So as the symptomology sets in and the sepsis sets in, you are going to see some pronounced manifestations of this kind of injury. So I don't think this is some sort of phantom injury that you're laying there and no one knows about, and then ultimately you die. Well, the timeline is still pretty limited. I mean, she's taken, and I think she's pronounced dead at like 6 a.m., is that right, something like that? Between 3 and 4 a.m., that's Dr. Sievert's testimony. The doctor goes back and says the death must have occurred. Correct. Yeah, she was brought in about 6 a.m. And so we're only talking about a few hours as these symptoms manifest themselves, and we're talking about the difference between taking her in at 8 p.m. and taking her in at whatever time they did the next morning? I think it was a little earlier than that. I think Stephanie Fleming had talked about about 5 or 6 p.m. when she first encountered Rachel, and Rachel was dry heaving. She had dark circles under her eyes. She was soaking wet. She was complaining. So the first time you're seeing real manifest symptoms, and the doctors were very clear, too, that this means it's setting in. This is the septic shock, which is ultimately leading to death. And so you're seeing those symptoms at 5 or 6 o'clock, and then certainly when she's laying on the couch that evening unable to move, you're seeing the pronounced manifestations of those symptoms. That pathology has set in. It was evident. Dr. Opphoven, their pathologist, says it is evident to anyone that night that she was in need of immediate medical attention. So they saw these injuries. They saw this pathology, and they had a duty to render aid to her, and when they sit there and let her die through those injuries, that becomes felony murder. Yeah, I guess I just don't find that your argument persuasive as to count four because the state's theory for conviction was so different. And, yes, you're now asking us to hypothesize an entirely different trial that never occurred. The one trial that we have that would be sort of similar, we know that the outcome was not favorable to your position. And I guess I'm sort of where Judge Clifton is, that under Strickland reasonable probability standard, how would we – we're not in a position to predict. Okay. What, this non-existent trial, what the outcome would be? Sure. And let me address this because that sort of gets to the other aspect of the district court's holding, which is the intertwined theory. Okay, there's no case law for this theory whatsoever, and, in fact, it violates a host of Arizona and federal law. And let me go through this. So there's not a single citation in the district court's order that would allow this. And, in fact, I think it violates this court's – What's the this? Would allow what? This intertwined theory. So if you can present medical evidence to undermine – Let me just be clear. I want to make sure we're not – I'm saying that the state's theory, as I recall at trial, was that the reason you should convict on counts four and five is because he's the one who inflicted the injuries, and therefore he knew just how life-threatening her condition was and nonetheless took no action. And affirmatively chose not to take action because he didn't want someone to recognize the consequences of what he had done. Now, if you change the he had done, the previous afternoon part, it looks like a different case. Okay. And so I think it does violate this court's precedent in Gallegos, which is that he's required to undermine with evidence each of the predicate felonies in order to succeed in federal – But focus on the intent level. Because he may not be able to undermine the count four conviction, but it seems to me he's got a powerful case that undermines the mens rea that's required to jump to felony murder. So I think you really have to treat the mens rea piece as a separate piece. I agree, Your Honor. And so I outlined all the evidence which I think supports that. And let me address the district court's holding in this. And it says, I'll credit Jones's statements during the interrogation that I'm taking her to the fire station next to the trailer park, and I see a police car, and I don't want to be suspected of child abuse, and I have an outstanding warrant, and so I'm not going to take her. And so that's the only court's holding theorizing that he could potentially be found guilty of a lesser mens rea, a reckless or a negligent. And the court's own example demonstrates intentionality. So it also shows that he's aware that she's harmed and in need of help, which satisfies state versus pain. He's taking her for medical help because he recognizes she's harmed, and then he sees a cop car, and based upon his own selfish reasons for not wanting to be caught, he decides, I'm not going to take her there. So he's aware she's harmed and makes the intentional decision not to take her to get help. And recall, too, that the district court didn't find any error in the Lopez children's eyewitness testimony of seeing Jones beat this child, and this happened just before he's taking her to get help. So the court's theory that, well, he doesn't want to be found guilty of child abuse, right. He was just beating this child moments before. He's now on the road to taking her to get help. There's still a piece missing there, and that is that he's weighing lots of things, and he's saying, gee, even if I did nothing, you take a child in with bruises and so forth, you're going to get grilled. I discovered that myself years ago. And it's a good thing, but I was taken aback when the people at the ER started questioning us about it. So he has reason to think, gee, they're going to start blaming me. And that doesn't tell me that on the other side of the equation, he knows that she's in grave danger. Indeed, it suggests, yeah, she's not happy, but she's going to have to tough it out for a few hours because I don't want to see a cop right now. That actually on one level could be used to support the notion that she's going to pull through this, or that's what he believes, because if he thinks she's going to die, he's in real trouble if he doesn't get help for her. So I'm not sure your scenario really supports the proposition that he had the mens rea required for felony murder. And again, Your Honor, that's not the law in Arizona. So when you look at the law in Arizona, his mental state does not go to the severity of the charges. It says endangered. Your brief says endangered. That can't mean just that she's going to suffer for a few hours, but she's going to pull through. I'll tell you what, State v. Payne, I think, answers this question, that the mens rea does not go to the condition of the child, that it only goes to his failure to render aid. No, your brief told me differently. Your brief acknowledged that he has to know that she's endangered. I mean, I'll read your brief to you. Sure. But... Accordingly, to prove that Jones acted unknowingly, the State was required to prove that he was, quote, aware or believed, close quote, that Rachel's health was endangered and that she needed medical treatment. Not just she needed medical and treatment, she was endangered. Right. Okay, if that's a proper statement of the law, you can't tell me Payne says, but it doesn't mean it's more than an alley that's going to last for a few hours. Okay, your Honor, I still think that's a correct statement of the law. He has to be aware that her health is endangered. What does endangered mean? So, endangered means her health is in a bad way. You know, and I may not be able to persuade you on this point. I would just refer you to State v. Payne. I think that's the correct statement of Arizona law, and you can read that for yourself, your Honor. But let me get back to you to the point that your Honor made about, well, this was not what the State's case and this is not what the State said. We cited in our brief the prosecutor's arguments where she laid out all the evidence, which basically starts from when Jones returned with his child after the multiple trips, and she carries on for pages to the jury about that's the evidence that supported the fatal neglect. And so the court can look to the indictment, which is ER 138, as well as the verdict form at 282. Jones was never charged with injuring her in this count, just only neglecting her. And so the law also has always been that a prosecutor's arguments to the jury are not evidence. In fact, the jury was instructed in this case that what the lawyer said is not evidence. In fact, the prosecutor in this case even said in her rebuttal argument to the jury, what I'm saying is not evidence. That's all technically true, but we're trying to make a predictive judgment, right? Right. And so what we have is a trial that occurred, and we're trying to remove one aspect of it. Would the result have nonetheless been the same? What I'm suggesting to you is that that's not really possible to do, given the way the – no? I would submit it is, Your Honor. And I think you can look at the evidence from trial in this case and start exactly when he returned to the trailer park with Rachel after these numerous trips he took and subtract everything else, everything else that happened before that, and the record is overwhelming to convict him of fatal neglect in this case. And I also want to talk about the other law that the court had to violate in order to do this is that the jury was instructed in this case to consider each offense separately, and I thought this was very strange language. I've almost never seen this in any other case that I can recall, quote, uninfluenced by your decision as to any other charge. That's pretty typical. You look at each count separately. So you look at each count separately. So we can't be here saying that, well, it's all intermingled, and the prosecutor is proposing this one theory, but the jury's instructed, okay, I can look at the evidence for the neglect, I can look at the evidence for the sex assault, and I can look at the evidence for him assaulting her for the abdominal injury. I mean, are you aware of other cases in which parents have been convicted of murdering their kids simply because they did not get medical attention in time? Oh, absolutely, Your Honor. I'm certain I could submit some of those cases after this argument if Your Honor would like to see that. You have a duty to render aid to your child if your child is violently harmed like Rachel was. I don't doubt that if the state proves that you know, that you know if you don't act in this window, your child's life could be taken, and you still do nothing. I grant you that. But I'm talking about what you've described to me, what you've described here, once you take out the component of his being the perpetrator, is recklessness. It's somebody who is aware of a risk that, yeah, boy, she does seem to be in a bad state, and I really do know that, you know, eventually she's going to need some medical care, but I'm not acting on that. That just sounds to me like ordinary recklessness. It doesn't sound like murder. Sure. Right? Well, I disagree. And, again, I think – If I don't know that my failure to act is going to potentially cause her to die – Yeah, if you're aware or put on notice that your child is pretty significantly injured – But not going to die. She's just going to – her suffering is going to be prolonged, granted that, but I'm not thinking that her life is in danger, and yet, unfortunately, she does die, and I'm horribly remorseful. And you're saying that, as a parent, I go before a jury, and you think 12 Arizonans are going to say, you know what, you should be convicted of murder for that? I just don't buy that. And I see that I'm out of time, if I could answer.  Judge, absolutely. Some of these injuries – Okay. Yeah, I would just, again, refer the court. State v. Payne says the mental state only goes to the failure to render aid, not to the condition of the child. And, in this case, Jones's own experts told you that it would have been evident to anyone with that child. Thank you, counsel. We'll give you a minute for rebuttal. Good morning. My name is Cary Sandman. I'm here with my colleague and co-counsel, Karen Smith. We're with the Arizona Federal Public Defender's Office. I think I just want to jump in to count four, since that's what you all have been talking about this morning. I should say, at some point, I do want to get touch base on the Martinez issues. We have been count four, and that's a good place to start. Okay. But I'm still wondering how all this fits together. Okay. Let me just start by saying that the prosecution prosecuted this case under a unified theory. I mean, with respect to counts one, two, three, four, the theory was that Jones had raped and assaulted this child. And that theory applied to all those counts. In the closing argument, and, again, what the prosecutor says isn't evidence, but she's summarizing the evidence, which the jury can rely on. She says Jones was the only person who knew the extent of the child's injuries, and he denied the child care to cover up his heinous crimes. Now, according to my colleague, the state can get up and say, you knew the injuries, you knew the specific injuries, but now in the defense you can't say you didn't know what the injuries were? I mean, it's obvious that when the prosecution's theory is that you knew the injuries, what they were specifically because you beat the child, you can present evidence that you weren't. Counselor, is there any conflict in the record regarding the fact that Mr. Jones knew the child was bleeding from her head, she was vomiting, and she was lethargic? Is there any conflict in the record about that? You know, at around 5 p.m. Could you answer yes or no? Yes. Absolutely there is. What part of that symptomology was he not aware of? I think that he knew that her head was weeping blood. He knew that she had been vomiting, that she couldn't hold down liquids. Did he also know she was lethargic? I would say absolutely he knew she was lethargic. So as a mother of three and grandmother of three, I mean, those appear to me, I'm not a doctor, I don't purport to be one, but those are kind of classic symptoms of concussion that I was told as a parent. If you have these three things, it's really serious. It could be a concussion, the child needs to be taken to the hospital immediately because death can result. That's what most parents are told about these particular symptoms. So it's hard for me to imagine that someone could see these symptoms and doubt whether or not the child should be taken to be seen by a medical provider. And I don't disagree with that. And, again, the mother is there. Mr. Jones. We're not talking about the mother right now. No, I know. We're talking about Mr. Jones. I understand. But the mother, and the district court made a finding to this point, which is very important. That evening, the mother said that she did not want to take the child to the doctor, to the ER, because she was afraid that she would be accused of child abuse. Now, here you have this guy, Mr. Jones, who's living with this family for three weeks in a trailer that's probably a quarter size of this room. And, you know, the mother is saying don't take her. He had assumed caregiver functions for this little girl. And I'm not saying he didn't have any responsibility. But, yeah, in the context of what the jury is being asked to do, which is to decide whether this is a man guilty of murder, you have the mother saying, and the district court made this finding, she did not want the child to go to the hospital. So now what does Mr. Jones do? You know, her head starts bleeding at around 5 o'clock for a wound that all the doctors, Dr. Howard, Dr. Opphaben, said was at least two days old. That had not been bleeding that day. And what Dr. Opphaben said, that that bleeding was a sign of what's called DIC, disseminated intravascular coagulation. But a non-doctor wouldn't know that. A non-doctor would not know. Of course not. But all he knows when in the late afternoon is that her head is seeping some blood. So he's going to take her to the fire department. No, I disagree with my colleague as to the facts. Because he didn't detour the fire department because he was afraid of being accused of abuse. What he told the police detectives was is that he was afraid to go to the fire department because he saw a police car there and he had just gotten out of jail for driving on a suspended license. And so he went to the Quick Mart. And while there, he told the detectives he saw an off-duty paramedic, not dressed in rural metro, but dressed in like a brown uniform, which we have presented evidence was associated with the Border Patrol paramedics at that time. And according to Barry Jones, the man looked in her eyes and said, keep ice on it. And he went home. And instead of telling Angela that he had been, saw this paramedic at the store, he told her he went to the fire department. Now, if I'm a mother and my child is very sick, as you've noted, Your Honor, you know, at some point I'm the mother. OK. You know, whether Barry Jones told me some fireman looked at her head. What does that mean? If I think my child, and I'm a grandfather and father too, and if I think my kids or grandkids are sick, you know, I don't go to the fire department. And so, again, I think Angela had a big influence on Barry that night when she said don't take him. Now we've got to look at the men's. I want to talk a little bit about the instructions that the jury received in the pain case. What the jury was instructed, and this is at ER 274, is to find Jones guilty of count four, they have to find first that the defendant acted under circumstances likely to cause death or serious physical injury. Now, what the pain case says is that there's not a mens rea. Mens rea evidence is not relevant to that particular fact. In other words, whether he's acting under circumstances that he doesn't understand are likely to cause death or serious injury, we don't care about his mens rea. But then the instruction goes on to say, and this is what's important, they also have to find the defendant having custody or care of a child allowed the health of the child to be endangered. Now, as to that element, mens rea applies. And so the focus for the jury is, did he allow her to be endangered intentionally or knowingly or recklessly or with criminal negligence? What's your understanding of what the word endangered means in that context? I take it it wasn't defined for the jury? I don't think endangerment was defined. What does it mean under Arizona case law, do you know? I think that the Verea v. Ryan case says that the defendant, to be convicted of intentional or knowing, he has to know his actions must result in the possibility of harm. So I guess endangerment means the possibility of harm. And Varella case, which is a federal case, cited a state law case for that proposition. So why on this record isn't there at least the possibility of harm given, as Judge Rollinson said, the severity? Absolutely, absolutely. But the point is, let me just give you the definition of recklessly. I know what it means. Well, but there's a definition the jury was given. It's not that part of a concept. It's from special recklessness in Arizona, is that why you're reading it? Yes. Okay. It means with respect to the result or a circumstance that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur. That's what it always means, counsel. Thank you for educating me about what I learned. Very good. So the jury finds that he acted recklessly. It's not a murder case. Okay. But on these facts, if all that he needs to know or intend, so forget about recklessness. All he needs to know is that if I don't do something, there is a possibility that this child will be harmed given her condition. Why isn't that met on this record? He has to know his actions. Right. And, you know. Be aware of all of the conditions the child is suffering from that Judge Rollinson mentioned. I think that I would go back to. Counsel, can I finish my question? Yes, I'm sorry. You have a habit today for whatever reason of wanting to change that. I apologize. Okay. He's aware of all of the circumstances that the child is, or the conditions that the child is suffering from. They sound pretty severe. And as Judge Rollinson said, most adults, I'm not a parent myself, but I take what she said as true, most adults know that if a child has those kinds of conditions, it's pretty serious. And certainly the child can suffer harm if no medical attention is given. And so he knows that. We're not talking about recklessness. He knows that. And I think the state's argument is here. Why isn't that enough for the jury to find the knowingly version of the crime? It's a subjective test. And if you're asking could the jury find that, maybe they could. But the Strickland test is not a sufficiency of evidence test. And it's a subjective test, and it's not objective. So in other words, when you look at all the facts and you say, well, wouldn't somebody know? The question is, what did he know? And I think that a persuasive argument could be made to the jury that he's either negligent or reckless. What was the evidence in the record regarding what he knew about the condition? What evidence was there in the record? You know, he knows that she has an upset stomach, that she's not able to hold down liquids, and he knows her head is seeping some blood. Is there anything in the record about what he knew regarding how serious the condition was? You know, there were, as my colleague said, there were people who came over that evening and said maybe she should see a doctor, and Angela was saying no. So, again, you know, I think this becomes. . . But whether or not Angela said no doesn't determine how serious he knew the illness was. There's no indication that he understood that. And I'd like to point the court to a couple of things that Dr. Oppoven and Dr. McKay said at the hearing. At ER 1100-01, Dr. Oppoven said the child may have looked okay until she became terminally ill. Now, terminally ill is where you're going to die. And she said the child may have looked that way until she became. . . And then Dr. McKay said that children of Rachel's age do not have the ability to express symptoms and it could lead to delay in seeking medical care. Well, there's evidence that suggests she didn't look okay the preceding evening. And so I'm not sure how the medical testimony helps us. I mean, if at 5 p.m., 6 p.m., sometime in the neighborhood of dinnertime the preceding evening, she is in such distress that other people's reactions are she needs help, there's no evidence that said it's too late already. And so I'm not sure the doctors help us with that. Is there something that I'm missing? She wasn't taken to the hospital for the 12 hours. It was too late by the time she was taken. It looks like she actually died maybe 3 to 4 a.m. But there are lots of hours in there, and I didn't see any evidence that said 6 p.m. was too late. So where are we? I think that we are. . . We have a case that was actually tried on the theory that Mr. Jones raped and assaulted this child. There was an affirmative case that he didn't want to be found out because he was guilty. Right. I understand that, and let's assume for the moment that part's off the table because there's reason to question that conviction. We still have the fact that he's there with her, as was Angela Gray, at a time when she's in such distress that everybody else thinks she needs help, and she doesn't get help, and he was found to be in a position to get her that help and chose not to. Why isn't that enough? It's a little more complicated because the mother is saying, don't take her. If Mr. Jones was there alone, or if the mother, for example, and I've seen cases like this where the mother is saying, I want to take her to the hospital, and then the boyfriend says, no, let's not. Here we have a case where the mother is saying, let's wait till the morning, and they waited, and I don't think either of them anticipated what would happen as a result of that. I certainly think that, you know, given everything that we know about what, we know what led to the verdict in this case, and we know what undermines confidence in that verdict. What undermines confidence in the verdict is that the jury decided Mr. Jones was guilty under count four because he raped and assaulted the child. And I think, you know, based on the new evidence, it's reasonably probable that a jury could have decided he had nothing to do with harming her, and they could have very easily decided, you know, when the prosecutor argued the evidence, she instructed the jury how to fill out the verdict form. When she said – I have to say, I think it's highly unlikely the jury is going to say he had nothing to do with harming her. Part of what lurks in the background here, and I want to be honest about this, chances are pretty good he's guilty because he was in a position to have inflicted abuse, and somebody surely afflicted abuse, and a lot of other candidates. But that's not the case that was presented. It's not the case we have in front of us. I just want to be honest in saying that he doesn't come in with the best posture. That's one of the reasons why he was properly afraid of – and Angela may have been properly afraid of being tagged for child abuse for who knows what kind of misconduct because somebody truly abused this girl, and they're the most likely people. But that's not the case that was presented to the jury. So it comes down to the medical assistance piece, and I'll go back and study state versus pain more. Endangered means something, and maybe I go back to the question Judge Watford was posing. What does endangered mean here? I guess once you decide a child is endangered, then you have four choices, and among them are reckless and negligent conduct. And when the jury got this case, after rejecting Dr. Howard's testimony, which was obviously a reasonable probability, after learning about the deficiencies in the police investigation, which the district court made a specific fact-finding about, after learning all that, learning that, for example, Becky had lied about this three-trip story. She had given four statements, of course, before this Mr. Jones trial, saying there were only two trips and Becky was fine after both of those trips. And then she testified at Jones' trial unimpeached, there were three trips, and the prosecutor said she was assaulted on the third trip. None of that ever happened. So this case is going to a jury with much of the prosecution's case in disarray, and now they're going to be asked to still find this man, to convict him of murder, when, I would say, at worst, he was either negligent or reckless, whether the child was endangered or not. This is sort of half-baked because it just now hit me, but on count four, are you seeking to set aside the conviction or simply the mens rea pieces of it that lead to count five? Is the conviction for failure to obtain medical treatment at issue? I think that the conviction has to be set aside, because the jury found intentional in knowing mens rea and he was convicted of murder, and I think that if that conviction is thrown out, then they have to retry him. If they choose to retry him, then they can retry him on that count, but there's really nothing that would be left of it. Even by your theory, it seems like it's hard to avoid a recklessness conclusion. You know, as I think one of you said this morning, it's difficult to predict what a jury would do. I think what I can say with some certainty is that there's a reasonable probability you would not have had a murder conviction on that count, and then what happens after that? On count four? You wouldn't have a conviction on count five, but I'm not sure that undermines the conviction on count four. For a lesser included? Well, it's count four. I don't think the mens rea pops up until you get to count five, and it may be if you can undermine the knowing or intentional part of count four, you can't have a conviction for count five, but I don't understand how that undermines the conviction for count four, because count four's conviction doesn't depend upon which level of mens rea. It does. It does? Yeah. How? Well, the jury was instructed that in order to find Mr. Jones guilty, they had to decide whether his conduct was intentional, knowing, reckless, or negligent. But they found that. Well, they found that based on evidence that he was the person that committed the underlying offenses, and in the absence of that, there's a reasonable probability that instead of finding him... I've got to tell you, I don't really understand that. I don't see how a jury could fail to have convicted him on count four, given his position and awareness of her distress. It may have been reckless rather than knowing, but he sure failed to act in a situation that almost everybody else would have acted in. But if they convict him of reckless child abuse under count four, then he's not eligible for... That's the count five issue. I understand that. Yeah. So that's what really popped into my head, and I'm raising now. I'm not sure count four is really at issue. That makes a huge difference to him, and so there's reason maybe for you not to have focused on that question before either. But as I think about it now, I think we're talking about count five for sure. I'm not sure that count four has been undermined by what we're talking about. This is sort of half-baked, but like I say, I'm going to give you a chance to speak to it if you want to. Can you just remind me, because I don't have the verdict form in front of me. So what is the verdict form for count four and count five? What does it look like? So the verdict form for count four has the jury decide whether he committed the offense, but then there's four boxes, intentional, knowing, reckless, and negligent, and they have to check off one of those boxes. And what did they do? They checked off intentional and knowing. Okay. All I'm saying is that there's a reasonable probability they could have checked other boxes or even acquitted him. Okay. And then what does the verdict form for count five look like? They were simply instructed if they found that he committed any of the underlying predicate felonies that resulted in a death that they could sign off on that verdict. Okay. So the mens re determination is made in the context of count four? Absolutely. That's the only place it's really made. I want to mention just very briefly some of the expert findings on the timing of these injuries because there was some commentary about that. But all of the experts, including Dr. Howard, agreed that the most likely time of these injuries was not on the afternoon of May 1st. Dr. Oppobin and Dr. Keen, with respect to the sexual injury, identified that injury as three weeks old. And Dr. Oppobin specifically was asked, well, what about the recent bleeding? And she attributed that, again, to the possibility of DIC. She found no re-injury of the tear, which she dated back weeks from May 1st. And so, again, you have an old wound that possibly predates even when Mr. Jones is living with this family, and it's re-bleeding as a result of this shock and trauma process. Dr. Keen also said that he couldn't associate any of the recent bleeding to the vaginal tear to any kind of trauma. He also found that the tissue samples indicated that that injury was days or weeks old. And, in fact, Dr. Howard testified, he was the original medical examiner, that he felt he had left the jury with the misimpression that the injury was most consistent with May 1, when it was really most consistent with April 30. The district court made findings regarding that. And he said the same thing with respect to the internal injury. He said that he basically conceded that he may have misled the jury about the timing. So I think it's clear, you know, not to me, but it was clear to the district court, and there's no clear error in the district court findings, that there isn't any really reliable or credible evidence tying these injuries to May 1. I wanted to just briefly talk about the alleged eyewitness testimony. Rather than do that, I think Judge Clifton suggested that maybe he had a question about Martinez. I have one. I don't know if it's the same one. But maybe you said you were going to get to that, and you're kind of running low on time. Maybe you could turn to that first, and then if you have time, you can do the eyewitness thing. The E2 question? Yes. That's what I'm interested in. Okay. I think we have to start with this, and that is that, and forgetting about Martinez just for this particular statement, but when a defendant shows an excuse for a procedural default, the federal court hears the case on the merits, hears the claim on the merits. So that's where we start, and that's always with new evidence. It doesn't matter whether it was presented in state court. Go ahead. Well, the question is, is it properly with new evidence? That's the issue we're here to resolve, whether or not there should have been new evidence taken in that context, because I don't think there's clear precedent one way or the other. Well, since the EDPA was passed in 1996, the Supreme Court has not abrogated the procedural default doctrine, which is to say that when a procedural default is excused, the federal court hears the claim, without regard to whether any evidence was presented in state court. But in the process of determining whether or not the procedural default is excused, how does E2 play into that hearing? Now, this Court said, I think Dickens and Dietrich, that E2 plays no role in connection with determining whether there's cause for procedural default. What does that mean, that E2 plays no role? It means that evidence is, the federal court is entitled to hear all of the new evidence, without regard to... Without his context? Yes. Now, that's with regard to showing the procedural default. Here, we have a question as to whether that same evidence can be used to prove the merits of the claim. And what I would say about that is that, number one, in Martinez, the Supreme Court said to the lower federal courts, thou shalt hear the merits of these claims that have been defaulted in state court. So the district court did that. Number two, what Martinez did, without overruling any Supreme Court cases in any of its earlier precedents, it said, based on equity, that we would no longer, at least in this narrow class of cases, of trial counsel ineffectiveness, we would no longer impute the negligence of post-conviction counsel to the client. And so it seems to me that settles the question. If we're not going to impute the negligence of post-conviction counsel to the client in these narrow class of cases, then we're not going to do that. And that, including with respect to E2, would be affected by that. Well, but I guess E2 seems to me slightly different, because Congress can come in and decide whatever rules it wants to impose, whether we like it as a matter of equity or not, right? Yes, but the statute doesn't say anything about when do you impute the negligence of the post-conviction lawyer to the client. And that's a judicial construction. And what the Supreme Court has said is that in the narrow class of cases where the importance of protecting the right to effective assistance at trial is a paramount right, just with respect to those claims, we are not going to impute negligence of post-conviction counsel to the client. And that's not upsetting a congressional determination, because they don't say anything about when the actions of the lawyer should be hoist on the client. Well, the language of the statute doesn't introduce that question of whose fault. I mean, it just says if the applicant has failed to develop the factual base of a claim in state court proceedings. And that's what we have here. These claims weren't developed. And so Martinez's Supreme Court was interesting. It made such a point of saying we're not overruling anything, and so it doesn't actually sweep aside some of the earlier decisions about E2 and I feel a little caught, but I understand the logic. I mean, it seems insane to say, okay, go develop the facts for the purposes of deciding whether there's a procedural default. And then once you've gotten past that step, close your eyes to all the evidence you just developed. That doesn't make any sense. But I'm sitting here looking at the statute, and the statute doesn't itself provide the exception that we're looking at. And Martinez says we don't overrule anything. And the Supreme Court says to courts, including this court on several occasions, it's our prerogative to overrule our prior decisions. You can't do it. You can't assume what we really would do when given the opportunity. And the court's never taken up the question. So I feel sort of handcuffed. How do we deal with the language of E2? You know, when the court constructed E2, for example, in the Williams case, which is the 2000 case where they first constructed it, they applied the ordinary rule. In other words, they didn't look to the Congress to interpret E2 in terms of, for example, whether post-conviction counsel's actions would be imputed to the client. They adopted their earlier case law, Coleman, and, you know, that's been the law for a long time. And in Martinez they changed that, I would argue. They decided that in this narrow class of cases we aren't going to impute negligence to the client because we want to get to the more important issue of, you know, whether trial counsel was ineffective. You know, you said something at the outset that I wasn't sure was right, but if you have case law I'd be interested in knowing what it is. Take away the Martinez procedural default context. It's kind of a unique scenario. But just in an ordinary case where a petitioner has procedurally defaulted a claim in state court but nonetheless is able to show cause and prejudice to overcome that, such that the merits can be reviewed, you suggested that E2 never applies in that context. And I guess why would that be true? I would have assumed E2 does apply. Is there a case law on that? We cited the Barrientos case, which is out of the Fifth Circuit, in our answering brief. And the Supreme Court has never abrogated procedural default. I mean, procedural default doctrine has been in effect solidly since 1996. I'm saying outside of the Martinez context. I grant you that the court has created this special non-imputation rule in the context of Martinez. But outside of that context, just ordinary procedural default, why wouldn't E2 apply? Because the output doesn't apply to cases that were never adjudicated in state court. No, that's pinholster. Pinholster, that rule is triggered only when there was an adjudication on the merits. And granted, when a claim has been procedurally defaulted, there isn't that. But E2 says nothing about the claim having to have been adjudicated on the merits, right? So that's why I'm saying why in the ordinary procedural default context wouldn't E2 kick in? Well, you know, the U.S. Supreme Court in our supplemental, we filed a letter, 28-J, with the court in House v. Bell, which was a different kind of procedural default case where the gateway was actual innocence. The court said E2 would not apply, that we want to get to the merits of an underlying claim when there's procedural default. So the House case is the closest case I could find. And then there's the Berentos case, which we cited in the answering brief. All right, counsel, you've exceeded your time. Unless there are questions, we'll hear rebuttal. Thank you. We have two minutes for rebuttal, please. Thank you, Your Honor. Let me address the Martinez E2 issue. Judge Watford, you hit it right on the head. We have a statute that applies. There's no case law that says E2 is not going to apply once you overcome the default. In House v. Bell, I think that's incorrect. All that case says is that the U.S. Supreme Court is reversing the Sixth Circuit's finding that the evidence didn't establish the schloop actual innocence exception to establish cause and prejudice to overcome the default. But the court violated E2 in this case by using all of this evidence for the merits of the claim. E2 absolutely does apply. And, in fact, I would cite pen site 17 of the Martinez decision, which says this specifically, cause is not synonymous with a ground for relief. A finding of cause and prejudice does not entitle the prisoner to habeas relief. That's exactly what the district court did in this case. Counsel, just so I understand your argument, are you saying that it was permissible to use this evidence to determine whether or not there was cause to excuse the procedural default, but then a line has to be drawn around that evidence, and it cannot be used on the merits? That's your argument? Exactly right, Your Honor. Is there any logic? I think there is, Your Honor. I wasn't good. You agreed too quickly. What procedure? But I was going to ask you, is there a case that supports the proposition that once all of that evidence has been taken to excuse the procedural default, then that evidence is no longer permissibly used for the merits? What case says that? I would say that this is a combination of looking at the Martinez decision, Michael Williams, Holland, Penholster, and the statute. Okay, so there's no one case that says this. So you're asking us to cobble together all of these sources and come up with the conclusion that the evidence that's been garnered in support of the cause to excuse procedural default is no longer in play. Correct. So is there any logic in saying we develop evidence for the purpose of satisfying the Martinez standard, which includes elements but not the same ultimate questions that have to be answered, and then you open the door to Federal court consideration of a claim that was specifically not developed and adjudicated in state court, and then say, okay, close your eyes to all the evidence that was developed for starting this Federal process in the first place? Is there any logic there? Your Honor, I see that I'm out of time, if I may answer. Okay. I actually, we've been dealing with this issue of sort of the fairness and the logic of this, and it occurred to me when I was preparing for this argument that we actually do this in other contexts. So we will admit evidence for one purpose, a classic example being 404B other act evidence, so we'll admit it for motive or modus operandi, but then we will require judges and juries to disregard that evidence for things like propensity, which is powerful evidence that could tend to be. So it's not a novel concept that you use evidence for the cause and prejudice for the procedural default, but then require the judge  In this case, you're saying it's okay to use it to open the door, and once you step through the door, you're going to fall to the ground because there's nothing there. The whole point of opening the door is that the issue wasn't developed before and the state court hadn't adjudicated it. So by definition, if you can't look at the evidence that's developed in the Martinez process, there won't be anything. Petitioner will never have anything to offer up because there was never an adjudication before. I think that depends. So 2254 in the statute applies. This is a separation of powers issue. Congress is entitled to say we don't care what equitable exception the United States Supreme Court has carved out for cause and new evidence and new claims. That would be unprecedented to fault a state court for violating the fundamental federal constitutional rights of a defendant based upon claims and evidence never before presented to any state court. And that's not what federal courts... But the Supreme Court took us there with Martinez. So we can't ignore the fact that the Supreme Court has carved out this area where we can sort of disregard E-2, at least for the purpose of determining whether or not there's cause to excuse a procedural default. I disagree. Martinez doesn't even mention E-2, let alone Michael Williams, Holland, Penholster, any of those cases. Martinez is a very narrow equitable decision to the longstanding rule of Coleman, and courts can do that. They have the authority to create an equitable exception, but they can't then, and this is why this claim always seems so bizarre to me, you cannot carve out an equitable exception with a statute. You can only do two things with a statute, find it unconstitutional or interpret it. It appears the Supreme Court has done that in Martinez, and we're bound to follow the Supreme Court's ruling on this unless and until Congress closes in no uncertain terms this loophole. So what are we supposed to do in a Martinez concept? If the issue was not developed in the state court and the federal court is not allowed to develop it, where are we left in terms of Martinez? Well, the federal court is allowed to accept the evidence, and I actually think we have some arguments this court may see, where I don't even think Martinez entitles a petitioner to introduce new evidence in federal court in support of a Martinez claim. But they take the new evidence, they determine that this new evidence establishes cause and prejudice to overcome the default, and then we address the very specific concern that the Supreme Court had in Martinez, which is that no court would ever hear the claim. And so before, when you had that claim procedurally defaulted, a court said, I can't even look at the claim. And so now we're saying, okay, you've established enough evidence here that we're going to overcome the default and look at just the claim, but E2 applies, and E2 is going to bar new evidence, but you can look to the state court record to determine if, in fact, that claim has any merit on any of the evidence that was developed. Yes, if the claim wasn't developed in state court. That's the conundrum I'm having with your argument, is that if the claim was never developed in state court, there will be nothing in the state court record. Right, and so I think all you'd be looking at, really, is you'd be looking at an egregious case of a Strickland, of a Sixth Amendment violation. You'd be looking at a vacuum, basically. Catch-22 was a big concept for at least some of us on the older side here, although I see they're doing a new production. Are you aware of the concept of catch-22? I am. Because this seems like exactly that. You're saying, okay, we're opening the door to the court to consider a claim that has never been developed, so once you get there, there will be nothing for you actually to consider and act on. I disagree. I don't think there's going to be nothing to consider. I think you'll look at the claim on the state court record. But there isn't one. Well, no, there will be a state court record. You'll be able to look at all the claims. You'll be able to look at trial counsels. That's the issue. That's the problem. That's what gets us to the Martinez hearing in the first place, that counsel did not develop this issue in state court. Yes, for this specific issue, and that may be the ultimate tension. And as Your Honor said, you follow statutes. This is what Congress has said. The court can create the equitable exception, and maybe this ultimately is the tension between Martinez and 2254, but the statute applies. Okay. Thank you, Your Honor. Thank you to both counsel for your helpful arguments. The case is argued and submitted for decision by the court. We are adjourned. All rise.
judges: Rawlinson, Clifton, Watford